NATIONAL PHONOGRAPH CO. v. AMERICAN GRAPHOPHONE CO.
(two cases.)

NEW JERSEY PATENT CO. v. SAME.

(Circuit Court, S. D. West Virginia.   December 19, 1910.)

Nos. 166, 167, 304.

1. PATENTS (§ 328*)— INFRINGEMENT — PHONOGRAPH RECORDS — PROCESS OF MAKING DUPLICATES.

The Miller and Aylesworth patent, No. 683,615, for a method of duplicating phonographic records, which consists in immersing a mold carrying the record in relief on its bore in molten wax successively until wax to the desired thickness has chilled thereon, it being necessary that the mold be kept at a lower temperature than the wax in which it is dipped, is not infringed by the Macdonald process, which consists in filling the mold with molten wax and superheating both to expel any air bubbles therein, then chilling by immersion in cold water, the only similarity in the two processes being one of result in obtaining a casting free from defects caused by airholes.

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—APPARATUS FOR MAKING DUPLICATE PHONOGRAPHIC RECORDS.

The Aylesworth and Miller patent, No. 683,676, for an apparatus for making duplicate phonographic records, claims 6 and 7 are void for lack of patentable subject-matter as being aggregations of elements rather than true combinations.   Claim 5 held not infringed.

3. PATENTS (§ 328*)—INFRINGEMENT—PROCESS OF DUPLICATE PHONOGRAMS.

The Joyce patent, No. 831,668, for a process of duplicating sound records, which consists in casting within a hot, seamless, tubular record mold fused wax-like material at substantially the same temperature as the mold, claims 3, 4, and 6, if valid, are limited to a process in which the mold is preheated.   As so construed, held not infringed.

In Equity.   Suits by the National Phonograph Company against the American Graphophone Company, two cases, and by the New Jersey Patent Company against the same.   On final hearing.   Decree for defendant in each case.

Herbert H. Dyke (Louis Hicks, of counsel), for complainants.
Philip Mauro and C. A. L. Massie, for defendant.

KELLER, District Judge.   The three cases above-entitled, both in the taking of proofs (so far as could be done) and in the argument, have been consolidated, and, although nominally the third case is brought by a different plaintiff, its interest is so closely allied with that of the plaintiff in the other two suits that for practical purposes it is as though the same parties were opposed in all three suits.   All three suits are brought against the defendant on the ground that a process practiced by the defendant for the production of duplicate sound records is an infringement of the several patents in suit.   Letters patent Nos. 683,615 and 831,668 are process patents, and No. 683,676 is an apparatus patent, and, as to the last-named patent, it would be more accurate to say that the allegation in the bill in that case is that the apparatus used by defendant in the production of its

duplicate sound records constitutes an infringement of the said letters patent No. 683,676 for apparatus for duplicating phonographic records. It will thus be seen that the issues presented in these cases involve an inquiry into a branch of the art of reproducing speech, and this inquiry naturally involves a consideration of some of the difficulties that successive inventors have met with and endeavored to surmount by the exercise of their inventive genius.

At this place, while admitting the right of the plaintiffs to take the course they have seen fit to take in prosecuting these suits in this judicial district—the home district of the defendant corporation—I must say that it was a matter of some surprise to me in view of the fact that the suits on letters patent Nos. 683,615 and 683,676 were originally brought in the district of Connecticut, where the chief works of the defendant are located, and that two prior suits brought against the defendant by the National Phonograph Company involving the process practiced by the defendant were litigated to final decree in that judicial district, and hence the judge of that district would necessarily have the advantage of the familiarity with the general subject acquired in that litigation.

In considering the several patents relied on by the complainant (or complainants) in these suits, it will be necessary, in a measure, to discuss them separately, but I may be permitted at the outset to say that it is difficult to see how the same process could at once infringe the letters patent No. 683,615 to Miller and Aylesworth, and No. 831,668 to Joyce; and it is not at all surprising that the expert testimony offered to show identity in the process practiced by the defendant with the processes disclosed in the several patents referred to should have been given by different experts, as I apprehend it would be difficult to find one expert who would be able to discover that defendant's process was identical with both of these process patents.

## No. 166—The Miller and Aylesworth Patent, No. 683,615.

The claims alleged to be infringed by the defendant's process are as follows:

"3. The method of duplicating phonographic records, which consists in immersing a mold or matrix carrying the record in relief on its bore in a molten wax-like coagulable material, whereby the material will accumulate on the bore of the matrix or mold and chill thereon in a layer of the desired thickness, in finishing the bore of the duplicate so secured, and in separating the duplicate from the matrix or mold, substantially as set forth.

"4. The method of duplicating phonographic records, which consists in immersing a mold or matrix carrying the record in relief on its bore in a molten wax-like coagulable material, whereby the material will accumulate on the bore of the matrix or mold and chill thereon in a layer of the desired thickness, in finishing the bore of the duplicate so secured, and in shrinking the duplicate from the matrix or mold, substantially as set forth.

"5. The method of duplicating phonographic records, which consists in immersing a mold or matrix carrying the record in relief on its bore in a molten wax-like coagulable material, whereby the material will accumulate on the bore of the matrix or mold and chill thereon in a layer of the desired thickness, in finishing the bore of the duplicate so secured before the latter has become hard, and in separating the duplicate from the matrix or mold, substantially as set forth."

The Macdonald process, used by the defendant, is thus described by Mr. Thos. H. Macdonald in his deposition given in these cases (Record, pp. 214, 215):

"Q. 5. What are the salient or essential steps which are practiced in making sound records by the defendant's process (hereafter to be understood as the process in use at defendant's factory during the period above specified)? A. The first step is to fill the mold with the liquid or molten wax. The mold and the wax are then raised to a temperature substantially above the melting point of the wax. It is allowed to remain at this temperature for a definite period of time, until all ebullition or bubbling has ceased and the wax is thoroughly limpid. It is then removed, and the mold is immersed in cold water. As the second step, chilling the mold (and consequently the wax in contact with it) from the outside. The next step is to remove the core, and after this the surplus material in the center of the wax mold is removed by a scraper, and the mold is then chilled down to normal temperature by being placed in an air blast. The molded record is removed, the ends cut off, and, when entirely cold, usually the next day, it is placed in a machine which holds it on the outside on each end. It is then reamed the size to fit the mandrel of the talking machine, and is then ready for the market.

"Q. 6. In the molding operation, as you have described it, have or have not the three steps of (1) superheating the melted material while in the mold, (2) maintaining the superheated temperature, (3) suddenly and symmetrically chilling from the outside, been always practiced in the manufacture of molded records by the American Graphophone Company? A. They have.

"Q. 7. How high above the melting point of the wax-like material is it heated? A. From 120 to 150 deg. Fahrenheit.

"Q. 8. How long on an average is this superheated temperature maintained? A. About five minutes for each mold."

Taking the process thus described in connection with the specification forming part of the patent No. 683,615, I think it must be apparent to any person of ordinary intelligence, not only that they are not identical, but they have surmounted pre-existing difficulties in the way of casting duplicate sound records by absolutely different methods, and that the only similarity in the processes is one of result. In the Miller and Aylesworth process the duplicate is secured upon the matrix by the process of progressive congealing of the material upon the bore of the matrix immersed in the molten material, and the success of the process depends upon the fact that the mold is kept at all times below the temperature of the molten material, which otherwise would not only cease to congeal, but would result in the remelting of that which had already congealed, and in the consequent failure to get a casting. As stated in the specification of the patent (page 2, line 31):

"But in no instance should the matrix or mold be immersed within the molten material for a long enough time to allow its temperature to be raised sufficiently to permit the deposited molten material thereon to become remelted. The reduced temperature of the matrix or mold relative to the temperature of the molten material causes the latter to become coagulated or chilled on the interior of the matrix and to deposit thereon to the thickness desired."

In the Macdonald process:

"The mold and wax are then raised to a temperature substantially (120 to 150 degrees) above the melting point of the wax. It is all allowed to remain at this temperature * * * until all ebullition or bubbling has ceased and the wax is thoroughly limpid."

These described steps, so radically different as to thoroughly differentiate the processes, were both devised for the purpose of obviating and overcoming a difficulty in the commercial manufacture of duplicate sound records by the process of casting, namely, the occurrence of air bubbles on the surface of the duplicate, which difficulty had for years puzzled such an experienced and resourceful inventor as Thomas A. Edison. The methods used in overcoming this difficulty by the Miller and Aylesworth process and by the defendants' process were diverse. The Miller and Aylesworth process is designed to prevent the entry of air bubbles into the molten casting, and for this purpose the mold or matrix, with an open bottom and also an open top, is immersed into the molten material, which, rising on the interior surface of the mold as it is lowered, forces the air within the mold steadily upward, and hence there is no entrapping of air bubbles within the material in the mold, as in the ordinary process of dipping or pouring. By the defendant's process air bubbles are naturally and necessarily entrapped in the step of filling the molds, and the design of superheating the material and allowing the molds to remain within the caldron and filled with the superheated material until all ebullition has ceased is to keep the material in a thoroughly molten condition sufficiently long to permit all such entrapped air bubbles to escape through the molten material to the free air, which is accomplished by means of the operation of the laws of gravitation. In other words, the process disclosed by the patent in suit prevents the entry of air bubbles. The defendant's or Macdonald process does not prevent their entry but expels them.

The Miller and Aylesworth process requires a relatively cold mold. The defendant's process is indifferent as to the temperature of the mold when introduced into the caldron, but it is necessarily heated to a high degree in the subsequent step of the process. The Miller and Aylesworth process as described in the specification (and I think with any apparatus that could be devised to carry it into effect) demands for successful operation an open bottom and the gradual lowering of the mold into the molten material or its equivalent of raising within the inner surface of the matrix molten material in some such way, as is disclosed in the patent to Edison, No. 667,662; whereas, in defendant's process, the mold necessarily has a closed bottom, and in filling it, as Mr. Macdonald says in his testimony (page 219, Q. 21):

"In my process, used by the graphophone company, the material is thrown in the mold in any convenient way. In actual practice it is filled by dropping the mold six or eight inches below the surface of the wax and allowing the material to flow over the top as rapidly as it can."

With regard to the reference to the claims in suit to the method of finishing the bore of the duplicates before removal from the mold, it is enough to say that this step is all that distinguishes the claims in suit from the broad claims 1 and 2 of the patent, as to which no infringement was alleged. The defendant does not finish the bore before removing from the mold, but does remove some of the surplus material.

It seems to me to be perfectly clear that the defense of noninfringement must prevail as to the suit upon patent No. 683,615. The whole

method pursued by defendant is essentially different from that practiced by the plaintiff, and it seems to me that this case can scarcely be differentiated from that brought by the plaintiff in the district of Connecticut upon Edison patent No. 667,662. and decided by Judge Platt in favor of the defendant. I hold that the defense of noninfringement is overwhelmingly made out by the defendant, and that this suit upon the Miller and Aylesworth patent, No. 683,615, must be dismissed.

### No. 167—The Aylesworth and Miller Patent, No. 683,676.

This patent is for the apparatus used in carrying out the process of patent No. 683,615.

The claims sued upon are as follows:

"5. An improved apparatus for making duplicate phonographic records, comprising a matrix or mold carrying on its bore the representation of the record to be duplicated, a disk upon which said matrix or mold is seated, said disk carrying concentrically within the bore of the matrix or mold a designation of such record, and means for depositing molten material within the matrix or mold and upon said disk, whereby the duplicate record will be formed and its designation be simultaneously cast or impressed upon the end thereof, substantially as and for the purposes set forth.

"6. An improved apparatus for duplicating phonographic records, comprising the combination with means for securing a deposit of a wax-like coagulable material upon the bore of a matrix or mold which carries the representation of the record to be duplicated, of means for finishing the interior of the duplicate while the latter is in position within the matrix or mold, substantially as set forth.

"7. An improved apparatus for duplicating phonographic records, comprising the combination with means for securing a deposit of a wax-like coagulable material upon the bore of a matrix or mold which carries the representation of the record to be duplicated, of means for forming within the duplicate while the latter is in position in the mold, a series of concentric ribs of gradually increasing diameters from one end of the duplicate to the other, whereby the duplicate may be properly received upon a tapering mandrel, substantially as set forth."

The claims in this patent must be read in connection with the specification in which the inventors state that their invention relates to an "improved apparatus for duplicating phonographic records." They then proceed to describe the essential features of the process which is set forth in patent No. 683,615, as follows:

[Said process] "consists in immersing in a bath of molten wax-like coagulable material a matrix or mold which carries on its bore the representation in negative or relief of the record to be duplicated, whereby the molten material will fill the bore of the matrix or mold, but will be excluded from its exterior, the reduced temperature of the matrix or mold relative to the molten material causing the latter to coagulate or chill upon the bore of the matrix until a layer of the desired thickness has been secured, after which the matrix or mold is removed from the bath of molten material, and the bore of the duplicate finished by a reaming-tool, the resulting duplicate being finally removed from the matrix by shrinking."

They then add:

"The object of our present invention is to provide an improved apparatus by which the process in question may be expeditiously carried out."

The main feature of the process above described is the formation, by chilling or coagulation, of a layer of the molten material upon

the bore of the matrix while the latter is immersed in the molten material, "after which the matrix or mold is removed from the bath of molten material."

It would seem to be clear that, since I have already held that the defendant does not practice the process of the plaintiff, it cannot infringe upon its apparatus patent designed for the carrying out of that process. However, in claim 5, the plaintiff refers to the use of a disk carrying concentrically a designation of the record to be duplicated, and it is alleged that the defendant uses a similar plate or disk in making its duplicates.

There can be no contention that the defendant uses all the essential items constituting the "means" or "improved apparatus" of the plaintiff described in this patent. Indeed it manifestly could not do so, since the apparatus of the plaintiff is designed to effect congelation while the apparatus is still immersed in the bath of molten material, and the defendant's process can by no means be so accomplished. Therefore the mere fact that defendant uses a name plate for impressing the designation upon its records cannot amount to an infringement of this patent, since the use of such has been common in apparatus for casting as was illustrated by Schuberth's patent No. 359,637, cited by defendant, and others referred to in argument. The feature of the lettering disk is an immaterial detail.

Claim 6 recites as essential features the improved apparatus "comprising the combination with means for securing a deposit," etc., of "means for finishing the interior of the duplicate while the latter is in position within the matrix or mold, substantially as set forth." It is claimed by the defendant that it does not in fact finish its records until after they are removed from the molds, though admitting that it removes certain surplus material while they are yet in engagement with the molds (page 215, fol. 10) ; but, regardless of facts in this regard, it is apparent that, since the defendant does not employ the specified means for securing the deposit of material, it is immaterial whether or not it finishes the record while the same is yet within the mold, as there is here no patent for this feature alone. Further than that, I think claim 6 is clearly void for the lack of co-operative relation between the several recited elements. There is no true combination but an aggregation. In Pickering v. McCullough, 104 U. S. 318, 26 L. Ed. 749, the court said:

"In a patentable combination of old elements all the constituents must so enter into it as that each qualifies every other."

Admittedly the reaming knife of claim 6 is an old device. It is not seen how it in any way coacts with or qualifies the other elements in the alleged combination.

In National Cash Register Co. v. Am. Cash Register Co., 53 Fed. 371, 3 C. C. A. 564, the Circuit Court of Appeals for the Third Circuit said:

"A combination, to be patentable, must produce a new and useful result as the product of the combination, and not a mere aggregate of several results, each the complete result of one of the combined elements."

See, also, Reckendorfer v. Faber, 92 U. S. 357, 23 L. Ed. 719, wherein the court fully discusses this principle.

Tested in accordance with the principles announced in these and many other kindred cases, I come to the conclusion that claim 5 is not infringed by the defendant, and that claims 6 and 7 are void for lack of patentable subject-matter, as being aggregations of elements rather than true combinations.

It results that this suit must be dismissed, with costs.

### No. 304—The Joyce Patent, No. 831,668.

This is a process patent granted September 25, 1906, to the New Jersey Patent Company, assignee by mesne assignments of Maurice Joyce, for a method of duplicating phonograms.

The claims alleged to be infringed by the defendant's process are the following:

"3. The process of duplicating sound records in wax-like material, which consists in casting within a hot, seamless, tubular record-mold, fused wax-like material at substantially the same temperature as the mold, cooling the mold and contents so as to cause the material to shrink away from the surface of the mold, and removing the hardened casting longitudinally from the mold, substantially as set forth.

"4. The process of duplicating sound-records which consists in casting within a hot, seamless, tubular record-mold, fused wax-like material at substantially the same temperature as the mold, allowing the material to set, cooling the mold and contents so as to cause the material to shrink away from the record-surface of the mold, and removing the hardened casting longitudinally from the mold, substantially as set forth."

"6. The process of duplicating sound-records in wax-like material, which consists in casting within a hot, seamless, tubular record-mold, fused wax-like material at substantially the same temperature as the mold, placing the mold in a water-bath and removing the hardened casting longitudinally from the mold, substantially as set forth."

The application which resulted in this patent had a long and arduous history in the Patent Office, the application having been filed October 13, 1897, and the patent issued to the ultimate assignee September 25, 1906, or nearly nine years after the filing of the application. This is a fact not to be forgotten or overlooked in construing the claims in suit.

So far as these claims refer to the utilization of the coefficient of contraction of the material used in molding the record as a means for longitudinally removing the casting from the mold, it is enough to say that that feature of the process, as well as all other features, except the use of a "hot" mold and material at substantially the same temperature, was embraced in litigation between the National Phonograph Company and the defendant before Judge Platt of the district of Connecticut in a suit brought upon the Edison patent, No. 667,662, which patent was held not infringed by defendant's process by Judge Platt. 135 Fed. 809. See opinion of Judge Platt in that case, with which I am fully in accord.

Narrowing the scope of this inquiry to those features as to which the present patent in suit may be distinguished from the Edison, No. 667,662, and the Miller and Aylesworth patent, No. 683,615, already

184 F.—6

discussed, we may get some light upon what was the inventive idea of Mr. Joyce as set forth in his specification. He says:

"The mold, core and base are slightly oiled and then heated, preferably to near the temperature of melted wax. This heating expands the mold slightly." (Page 1, line 100, etc.)

This language in the specification is the only basis for the claims in suit, which were not formulated until more than eight years after the application was filed (December 22, 1905), not until the application had been assigned to the National Phonograph Company, and by the latter to its present owner, and not until after the litigation in Connecticut upon the Edison patent, No. 667,662, had been terminated. The Patent Office record of the Joyce application shows that the claims in suit were rejected January 6, 1906, in view of patents cited by the examiner. In subsequent correspondence Mr. Dyer, attorney for Joyce, presented an argument which induced the examiner to allow these claims, and in the course of which argument he said:

"A process which may be useful for pressing a record would be unsuccessful for casting a record. There is much more likelihood of entrapping air in a casting operation, and, in order to prevent this, the mold is heated to the melting point of the wax before the molten wax is introduced, so that it will not congeal instantly upon coming in contact with the mold, and there will be an opportunity of allowing air to escape which would otherwise be entrapped at the surface of the mold."

This argument was effective with the examiner and the claims were allowed, but it would be interesting to know how much of the reasoning involved in this argument was derived from Mr. Joyce's description of his process in which he declares that heating the mold "expands it slightly," and relatively how much from the Connecticut litigation and the discussion of the problem of air bubbles which occurred therein, and as to which Judge Platt in upholding the defendant's process stated that "air bubbles in the melted material drove Mr. Edison away from casting for many years."

In disposing of this case, it is not necessary for me to hold that these claims are absolutely void. An expert in the employ of plaintiff produced three duplicate records (more or less injured) which he swears were produced by means of preheating the mold in the manner prescribed by the Joyce process, and I am unable to say that the process cannot be made use of for commercial purposes, though I have very serious doubts about it. But I am clear that these claims should and must be construed as limited to a process in which the mold is preheated, and, so construed, they are not infringed by the process of defendant. The so-called "Commercial Joyce apparatus" I am convinced was never evolved from the brain of Joyce, but that its use in the establishment of the plaintiff came after a revision of the opinion held by Mr. Edison upon the subject of the effects of superheating the waxy material at the time he gave his deposition in the Connecticut suits, and in which he said, speaking of the Macdonald patent:

"Q. 78. Is the suggestion of superheating the wax contained in this patent one which is calculated to get rid of the air bubbles? A. No; our experi-

ence is that it increases them, and what is the object of superheating I can't comprehend. It only results in the corrosion of the mold." (Defendant's Paper Exhibits, p. 46.)

As I have already said, I am very doubtful whether the claims in suit can be sustained as valid for any purpose, in view of the disclosures of the application of heat to the mold, disclosed in prior patents involving the art of casting or molding, and with which art these claims are distinctly allied; but, even if they be valid, they are narrow, and should and must be construed by reference to the description of the process as contained in the specification which discloses the idea in the mind of Mr. Joyce when he adopted the hot mold. This was merely to secure the running of the fused material so as to make a closer contact with the surface of the mold, and he accomplished this result by preheating the mold to such degree as to bring it "in harmony" with the fused material prior to beginning the process of casting. There is no suggestion in his specification that he ever knew or appreciated the difficulty which had driven Mr. Edison away from the casting process for so long, viz., the development of air and gas bubbles upon the sides of the matrix or mold, but he had found that the tendency of the fused material to congeal on the surface of the matrix of a cold mold of the character used by him made the result imperfect, and his sole idea, as gathered from his description, was to overcome this difficulty. If this be invention it is certainly contained within very narrow limits in view of the disclosures of prior patents in the art of casting.

I can conceive of no fair or reasonable interpretation of the claims of the Joyce patent involved in this litigation that does not demand the preheating of the mold, or that involves the continued superheating of the mold and material. The claims are for a process of casting fused material in a hot mold, and the process as described in the specifications of the patentee and in the argument of his counsel, upon which the claims in suit were fully allowed, prescribed this preheating, its approximate degree, and the only purpose known to the inventor, for the requirement, which was that the material used in the casting might run more freely and make a sharper contact with the mold than would be the case if the mold were cold enough to congeal the material in the act of pouring the casting.

Again, the very use of the term, "casting within a hot, seamless, tubular mold," in terms limits the process to the one of casting and negatives the idea of superheating the material or mold, or continuing the heating of either after the material is introduced into the mold. Neither claim nor specification discloses any idea of overcoming difficulties or securing advantages in the process other than those supposed to be secured by preheating the mold to substantially the melting point of the wax-like material to be used.

The Macdonald process distinctly provides for superheating both mold and contents, and, after the introduction of the material continuing the superheating until the material is limpid; the purpose being, not to prevent the entrapping of air bubbles, for this cannot be done in a casting process that involves pouring or its equivalent, but to drive

them off through the limpid superheated material by the very continuance of the high degree of heat.

It results that the bill in this case must be dismissed, at the cost of the plaintiff.